## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 04 2020, 11:10 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Rachelle N. Ponist
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Denise F. Hayden
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Stephen Hays Sanner, *Appellant-Petitioner,* | June 4, 2020 |
| v. | Court of Appeals Case No. 19A-DR-1843 |
| | Appeal from the Marion Superior Court |
| Veronica Louise Brown, *Appellee-Respondent.* | The Honorable Cynthia J. Ayers, Judge |
| | Trial Court Cause No. 49D04-1611-DR-40557 |

**Altice, Judge.**

## Case Summary

[1] Stephen Sanner (Stephen) appeals from the trial court's distribution of marital property following the dissolution of his marriage to Veronica Sanner, now Veronica Brown (Veronica), asserting that the trial court abused its discretion in

valuing and dividing assets. Stephen raises seven issues that we consolidate and restate as:

> I. Did the trial court abuse its discretion in its valuation of a home owned by the parties, Stephen's 401(a) retirement account, and a physical therapy bill?

> II. Did the trial court err when it found that Stephen had exclusive possession and control of the parties' small business called Internet Guys, LLC and thus excluded from the marital estate his payment of bills related to that business after the date of filing?

> III. Did the trial court err when it divided the marital estate 60/40 in favor of Veronica?

We affirm in part, reverse in part, and remand.

## Facts & Procedural History

Stephen and Veronica married in May 2011, and Stephen petitioned for dissolution of marriage on November 15, 2016. They have no children. At the time that they married, Stephen was less than eighteen years of age and in high school. He did not graduate, but later obtained his GED and then an associate's degree in Applied Science in 2014. Before their marriage, Stephen and Veronica had a business venture called Simone Design, Inc., which

involved creating virtual clothes for avatars in a world called Second Life.[1] The business dissolved sometime between 2009 and 2011.

[4] After Simone Design but before they married, the parties began operating Internet Guys, which provided support and services for anti-virus protection and repaired and maintained hardware and software for clients. Internet Guys was incorporated in Veronica's name, and they operated the company out of their marital home. She considered Stephen a "co-owner," as he had access to and was a signor on the company's bank accounts and Quick Books. *Transcript* at 81. Stephen described his duties there as an operations manager.

[5] On the Friday before Stephen filed his petition for dissolution, Veronica removed $21,900 from Internet Guys' checking account. According to Stephen, this "zeroed out the account," but, according to Veronica, she left a small amount remaining in the account. Ultimately, the bank closed the account in December 2016 after several checks bounced. *Id*. at 23. At or near the time that she withdrew the money, Veronica removed Stephen's name as a co-signor and cancelled his bank card on the account.

[6] At the time of filing, the parties owned two homes, one located in Mooresville, which was their marital residence, and one in Indianapolis on Oriental Street. At some point not clear in the record, Veronica's daughter, Betty Lou Burton,

---

[1] Stephen testified that Simone Design was his business and that Veronica did some graphic design work for the company, while Veronica testified, "I built Simone Design" and "had been running" the company "for two years prior" to its May 2007 incorporation with the Secretary of State. *Transcript* at 78, 106.

moved in and resided as a tenant in the Oriental Street home. In terms of assets, Stephen also had a 401(a) retirement account with IBEW #481 Defined Contribution Plan & Trust, and Veronica had some antiques. The parties owned three vehicles with little to no value and a $7500 lawn tractor that was stolen during the pendency of the dissolution.

[7] On November 28, 2016, the trial court held a preliminary hearing at which the parties' oral preliminary agreement was read into the record.[2] Their agreement provided that, beginning one month from the date of the hearing, Stephen was to pay Veronica $1000 every two weeks for six months, and Veronica "will continue to be on his [health] insurance until the divorce is over." *Appellant's Appendix* at 111. Veronica was to "sign over" Internet Guys to Stephen and "add him on all the accounts" of the business. *Id.* at 113. Both parties agreed not to encumber any marital assets.

[8] In August 2017, Veronica filed a motion to compel/for contempt, asserting that Stephen had failed to abide by the terms of their preliminary agreement. Following a hearing, the trial court issued an order finding that Stephen had

---

[2] The parties indicated that their agreement was going to be reduced to writing and filed with the court but that never occurred.

failed to pay Veronica $1000 every two weeks as agreed and that he owed her $14,000.[3]

[9] On August 15, 2018, the trial court held the final hearing in the dissolution. Stephen, Veronica, Betty Lou, and Veronica's accountant, Lisa Weisp-Sharp, testified. There was conflicting testimony on several matters. Particularly relevant to this appeal are the following: the value of the Oriental Street house; the value of Stephen's 401(a) account; the value of a physical therapy bill for services rendered to Veronica; control of Internet Guys after separation; and the earning ability of each party.

[10] As to the value of the Oriental Street home, Stephen presented an appraisal that valued the home at $122,000 but testified that the home's value needed to be reduced by $22,448 for repairs to the lateral sewer line and by $33,987 for an existing mortgage on the home as of the date of filing. He presented an estimate for the plumbing repairs prepared by Hope Plumbing on May 5, 2017. The copy of the appraisal admitted at trial did not mention the broken sewer line or the estimate for repair, and Stephen testified that the Hope Plumbing estimate occurred after the appraisal, and that the ruptured line would not have been known to the appraiser. On cross-examination, Stephen acknowledged

---

[3] The order directed that "[t]he parties may agree as to how the payment is to be made or may wait until the final hearing and incorporate this amount owed by Husband into the court's marital estate calculation." *Appellee's Appendix* at 8.

that the Hope Plumbing estimate was prepared in May 2017, months prior to the September 2017 appraisal.

[11] Stephen acknowledged that he refinanced the Oriental Street house during the pendency of the action, stating that he and Veronica had agreed to refinance the home well before he filed for dissolution but that the process took months to complete, such that it closed in December 2016, after the petition for dissolution was filed. Stephen testified that he used the proceeds to pay various bills, including the mortgage and utilities on both homes.

[12] With regard to his 401(a) retirement account, Stephen submitted a quarterly statement from IBEW #481 Defined Contribution Plan & Trust that showed a balance in his account of $46,155.57 as of September 30, 2016. He also presented evidence of two checks he wrote from his personal account to the defined contribution plan in December 2016 in the amounts of $1448.26 and $1413.05.

[13] As to Internet Guys, Stephen testified that when Veronica withdrew most or all of the funds from the bank account, he removed from the home office his "personal laptop," two printers, and the company's checkbook. *Transcript* at 26. Stephen stated that his laptop did not have access to the customer lists or QuickBooks. Stephen testified that during the pendency of the dissolution he paid various business-related expenses, including $3940 to cover payroll for the final paycheck owed to several employees after the company bank account was closed, $1526.28 on a line of credit, and union contributions.

[14]     As to Stephen's income and earning ability, Stephen testified that he was doing IT work for a company called Daedalus and Iapyx, LLC and was earning $46 per hour working full time but that, on the Monday following the hearing, he was starting classes at IUPUI as a full-time student, and would be cutting back his work hours to fifteen per week at $27 per hour. He testified that Veronica did not work "98% of the time" that they were married, working only short-term jobs at Goodwill and Long John Silvers, and that "[s]he said she wasn't capable of working but didn't specify why." *Id*. at 29.

[15]     Stephen acknowledged that he had not paid Veronica the agreed-upon bi-weekly $1000, which he referred to as a "stipend," explaining that paying her was conditioned on her turning over Internet Guys, which she did not do. *Id.* at 40. With regard to the health insurance, Stephen testified that the insurance was employer-funded, paid through Union contributions, and that, when Veronica closed the Internet Guys bank account, he no longer had access to the business account and the insurance lapsed at some point.

[16]     Betty Lou testified that Veronica was her biological mother but she was raised by someone else and that Stephen was her friend. Betty Lou stated that she had been employed at Internet Guys, where she performed IT work and, in effect, was an office manager and had access to QuickBooks. She characterized Veronica as "not very" involved with Internet Guys when it was in operation. *Id.* at 57. Betty Lou stated that, when Veronica withdrew the money from Internet Guys' account, she took her laptop and removed three desks that she had purchased with her own money. Betty Lou testified to organizing

Daedalus and Iapyx on November 14, 2016, which was near the same time that Internet Guys quit operating and Stephen filed his petition for dissolution. Betty Lou stated that there essentially was no difference between the two companies in terms of the type of work performed. She explained that she started the new company because Internet Guys clients were calling and either could not reach Veronica or did not have a good relationship with her and because she did not receive her last paycheck from Internet Guys, although Stephen eventually paid her. Betty Lou stated that Stephen was a contract employee of Daedalus and Iapyx and that he had access to view but no authorization to conduct activity on the company's bank account.

[17] Stephen rested his case, and Veronica called as a witness her accountant, Lisa Weisp-Sharp (Sharp). Sharp testified that between the years of 2007 and 2014 she had been involved with the bookkeeping for Stephen and Veronica's two businesses – Simone Design and Internet Guys – and she developed a friendship with Veronica. Sharp stated that in 2017, Veronica contacted her and asked her to prepare financial statements to close up Internet Guys. Sharp testified to certain outstanding accounts receivable based on information from QuickBooks, and she estimated that Stephen and Veronica "were paying themselves" approximately $170,000 annually. *Transcript* at 70. On cross-examination, Sharp stated that she gifted Veronica antiques valued at $5000-6000.

[18] Next, Veronica testified. With regard to the Oriental Street property, she stated that the $122,000 appraisal of the home was proper and that there was no need

to reduce it for repairs, noting that the home was habitable as Betty Lou was living as a tenant there. With regard to the refinancing of that house, Veronica stated that she and Stephen had discussed the matter of refinancing before the petition for dissolution was filed, but she always was opposed to the idea and never agreed to do so. She believed that Stephen refinanced the property and kept the money.

[19] Veronica presented a summary exhibit of marital assets that reflected a value for Stephen's 401(a) as of the date of filing (November 15, 2016) of $48,683.31. She did not testify to or present evidence to explain how she arrived at that figure, which was an increased value from the September 30, 2016 value of $46,155.57 presented by Stephen.

[20] Veronica stated that she had been away from their marital residence in Mooresville for a week or so around the time that Stephen filed the petition for dissolution. She said that when she returned home, the doors were "wide open" and "everything" in the Internet Guys' office was gone, including desks, laptop computers, cell phones, and the checkbook. *Id.* at 75. She said when she called the phone number for Internet Guys in the weeks that followed, Stephen or another Internet Guys employee answered. Veronica said that the missing desks had been purchased with Internet Guys' money. Veronica described that she "never had access to the Internet Guys website," that she signed the checks for the company and ran payroll, but that she often signed blank checks that Stephen would complete. Veronica admitted to removing the $21,900 from the bank account but that, per the parties' preliminary agreement, she returned

approximately $8200 to Stephen to pay bills.  In response to questioning about whether she signed over Internet Guys to Stephen in accordance with the parties' preliminary agreement, she offered that Stephen took the assets and customers, and had access to company emails and QuickBooks, so that there really was nothing to turn over.

[21]     Veronica stated that in the spring of 2017, the basement of the Mooresville home flooded and resulted in a need to replace the furnace.  She contacted the insurance company, who sent a check to her.  Veronica gave the check to Sharp to give to Stephen, with the intention that he get the repairs done, but instead he returned the check to the insurer.  Because the furnace was never repaired, the pipes in the home froze and/or leaked, causing ceiling damage.  Veronica testified that she repaired the furnace at her own expense.

[22]     Veronica testified to incurring medical bills during the months of January 2017-April 2017, for physical therapy to her knee.  She presented a bill from ATI, a provider, indicating a total balance owed of $4204.31, with a patient balance of $527.26 and an insurance balance of $3577.05.  Veronica testified that Stephen was to maintain health insurance on her during the pendency of the action, but she believed it lapsed around March 2017, and she did not know whether insurance had paid the $3577.05 balance.

[23]     Veronica testified that she currently was working six days per week at a call center and had been there for four or five months.  She did not testify as to her hourly wage.

The trial court took the matter under advisement. On September 14, 2018, the trial court issued findings of fact and conclusions of law, which included:

### Findings of Fact

10. At the time of filing, the unpaid balance on Mooresville was One Hundred Fifty-Nine Thousand Five Hundred Sixty Dollars and Thirty Cents ($159,560.30). The home has a negative equity in the amount of Eighty-Seven Thousand Eight Hundred Sixty Dollars and Thirty Cents ($87,860.30); the deficit to be allocated between the parties.

11. Prior to separation the parties remodeled the Oriental home. The Oriental home appraised for One Hundred Twenty-Two Thousand Dollars ($122,000) as of September 11, 2017. An estimate for plumbing damage to the main sewer line was performed May 5, 2017. *The state of the sewer line and necessary repairs were known and taken into consideration at the time of the appraisal.*

* * *

27. During the marriage, the parties owned and operated an information technology home-based business, known as Internet Guys.

* * *

29. Husband asserted he was an employee of Internet Guys and had no ownership interest in the business.

* * *

31. At the time Husband left the mar[ital] residence, he removed office equipment from the business including computers, printers, desks and cell phones that belonged to Internet Guys. Husband also took possession of the Internet Guys checkbook.

* * *

33. On November 14, 2016, Wife withdrew Twenty-One Thousand Nine Hundred Dollars ($21,900.00) from the Internet Guys bank account.

* * *

35. Pursuant to the preliminary agreement, Wife returned Eight Thousand Two Hundred Dollars ($8,200.00) to Husband as payment for business expenses Husband had paid. It was further agreed the sum of Thirteen Thousand Seventy Hundred ($13,700.00) retained by Wife would be addressed at final hearing.

36. Further, pursuant to the preliminary agreement, Wife was ordered to turn the Internet Guys business over to Husband.

37. The Internet Guys checking account was closed out by the bank in December 2016 due to its overdrawn status.

38. Husband paid certain business-related debt on behalf of Internet Guys as follows:

> a. Business Line of Credit: One Thousand Five Hundred Twenty-Six dollars and Twenty-Eight Cents ($1,526.28).

b. Union expenses: Eleven Thousand Three Hundred Eighty-Three Dollars and Sixty Cents ($11,383.60)

\* \* \*

43. Daedalus and Iapyx, LLC consists of the same services, same employees, and identical customers as Internet Guys. Additionally, when someone calls the Internet Guys phone number, the calls are routed to employees of Daedalus and Iapyx, LLC. The items removed by Husband from Internet Guys are now used by Daedalus and Iapyx, LLC.

44. Husband has a 401(a)-retirement account through a union from and a company where he was previously employed. He continued to contribute to the account after the parties' separation. *The vested balance of Husband's retirement account as of the date of filing was Forty-Eight Thousand Six Hundred Eighty-Three Dollars and Thirty-One Cents ($48,683.31).*

\* \* \*

47. The parties own a lawn mower valued at Seven Thousand Five Hundred Sixty-Four Dollars and Three Cents ($7,564.03), including attachments, after the outstanding loan was paid off. The lawn mower was stolen from the Mooresville residence shed. To replace would incur a Fifteen Hundred Dollar ($1,500.00) insurance deductible.

\* \* \*

49. The parties' joint debt at the time of filing includes:

a. HH Gregg: $ 651.99

b. Hoosier United Credit Line: $ 4,972.97

c. Hoosier United Credit card: $ 3,942.89

d. Menards: $ 685.51

e. Care Credit: $ 517.60

f. Chase credit card: $ 937.50

g. Wife medical bill (Harris) $ 395.72

h. *Wife medical bill (ATI) $ 4,204.31*

50. Following the filing of the Petition herein, Wife was unemployed for some period. *Wife now has employment in a call center earning Twelve Dollars ($12.00) per hour*.

51. Pursuant to the preliminary agreement, Husband was to pay Wife One Thousand Dollars ($1000.00) every other week for a period of six months as spousal maintenance beginning December 28, 2016. Following hearing held September 11, 2017, Husband was found to owe Wife a total of Fourteen Thousand ($14,000), as none of the maintenance had been paid.

52. Husband was required to maintain health insurance on Wife following the preliminary agreement. Husband allowed Wife's insurance coverage to lapse.

* * *

## Conclusions of Law

57. Here, Husband refinanced the Oriental home after a temporary restraining order was entered at the Preliminary Hearing. Husband claimed the funds were utilized for marital expenses; however, no documentation or accounting was provided as to the expenses that were paid. Therefore, the Court has inadequate information to apply the dissipation factors. Although Husband conceded to Wife receiving her portion of the full value of equity, Husband requested reimbursement for funds for loans and expenses related to Internet Guys as well as mortgage and utilities payments for the Mooresville residence.

\* \* \*

59. *Husband earns substantially more than Wife since the parties' separation.* Husband failed to pay spousal maintenance as ordered.

\* \* \*

61. *Husband took control of the parties' business upon vacating the Mooresville home, Husband's control was reaffirmed following preliminary hearing when Wife was to turn the business over to Husband. At that point, Husband had already converted Internet Guys business to [] Daedalus and Iapyx, LLC.*

\* \* \*

65. As the business was in exclusive control of Husband pursuant to agreement of the parties, and as neither estimated a value [for] the business, any debts paid on behalf of Internet Guys or loans to the company were also excluded from the marital division calculation.

66. The Court finds equitable division of the marital pot as follows:

a. Husband Will be awarded both the Oriental and Mooresville properties. Husband will be awarded the automobiles, including any expenses associated with them. Husband will take the lawn mower (or the insurance claim value thereof). Husband will be solely responsible for the mortgage refinance of Oriental.

b. Wife shall cooperate with the police department and the homeowner insurance company regarding the lawn mower to ensure that Husband receives the insurance proceeds.

c. Wife Will be awarded the antiques and she will be given credit for the Thirteen Thousand Seven Hundred Dollars ($13,700.00) already received.

d. Husband shall receive no credit for alleged loans to Internet Guys or debts paid by Internet Guys.

e. Husband shall receive no credit for utility and mortgage payments made on Mooresville residence.

f. Husband shall be responsible for the parties' joint credit card debt, line of credit, and Wife's hospital bills.

g. Wife shall be awarded one-half (1/2) the value of Husband's retirement account as of the date of filing. Wife is entitled to an equalization payment from Husband in the amount of Twenty-Four Thousand One Hundred Thirty-Five Dollars and Forty-Seven Cents ($24,135.47).

h. Wife shall also be entitled to her prior spousal maintenance order of Fourteen Thousand Dollars ($14,000.00) as this Court

previously ordered November 28, 2016. The total amount owed to wife is Thirty-Eight Thousand One Hundred Thirty-Five Dollars and Forty-Seven Cents ($38,135.47). Husband shall pay wife this amount within One Hundred Twenty (120) days of this Decree of [D]issolution.

*Appellant's Appendix* at 36-46 (emphases added).

[25] On October 14, 2018, Stephen filed a motion to correct error and to reconsider, asserting various claimed errors, including: (1) the value of the Oriental Street house should be reduced by both the mortgage and the $22,448 in sewer repairs; (2) the value of the stolen lawn tractor should be reduced by a $1500 insurance deductible; (3) the value of Stephen's 401(a) account should be $46,156.57 as reflected in the plan statement ending September 30, 2016 that was admitted at trial; (4) Stephen did not have exclusive control of Internet Guys after date of filing, as the trial court found, because Veronica removed the money in the company's bank account and he lost access to online activities including banking and QuickBooks; and (5) Veronica should be responsible for half of the following: (a) the $18,166.23 that Stephen paid in marital debt on credit cards and lines of credit; (b) utilities on the Mooresville residence after Stephen moved out; and (c) business debts that Stephen paid such as the last payroll and a line of credit.

[26] Stephen attached to his motion, among other things, the appraisal of the Oriental Street home because the copy of the appraisal that was admitted at trial was incomplete due to the fact that inches of text at the bottom of most or all pages was missing. The full appraisal included the following: "Owner

provided appraiser with estimate of sewer repair for $22,448 from Hope Plumbing. For this report the hypothetical assumption [is] that repairs will be done by the city with no cost to the home owner." *Appellant's Appendix* at 64.

On May 30, 2019, the trial court held a hearing on Stephens's motion. On July 10, 2019, the trial court issued an order granting Stephen's motion as to the lawn mower, finding that "[t]he value of the tractor with the deduction is $6,064.03 not $7,564.03, as found in the decree[,]" but denied Stephen's other requested relief. *Id*. at 106. The court's division resulted in an approximate 60/40 split in favor of Veronica. Stephen now appeals.

# Discussion & Decision

Initially we observe that the dissolution court entered special findings of fact and conclusions thereon pursuant to Ind. Trial Rule 52(A). Accordingly, our standard of review is two-tiered: first, we determine whether the evidence supports the findings, and second, whether the findings support the judgment. *O'Connell v. O'Connell*, 889 N.E.2d 1, 10 (Ind. Ct. App. 2008). Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. *Id*. The judgment will be reversed if it is clearly erroneous. *Id*. To determine whether the findings or judgment are clearly erroneous, we consider only the evidence favorable to the judgment and all reasonable inferences flowing therefrom. *Id*. We will not reweigh the evidence or assess witness credibility. *Id*. Even though there is evidence to support it, a judgment is clearly erroneous if the reviewing court's

examination of the record leaves it with the firm conviction that a mistake has been made. *Id*.

### I. Valuation of Assets and Debt

[29] Stephen challenges the trial court's valuation of the Oriental Street house, his 401(a) retirement account, and Veronica's ATI physical therapy bill. A trial court has broad discretion in ascertaining the value of property in a dissolution action. *Id.* We will not reweigh the evidence and will consider the evidence in the light most favorable to the judgment. *Morey v. Morey*, 49 N.E.3d 1065, 1069 (Ind. Ct. App. 2016). We will find no abuse of discretion if the trial court's decision is supported by sufficient evidence and reasonable inferences therefrom. *O'Connell*, 889 N.E.2d at 10. A trial court, however, "abuses its discretion when there is no evidence in the record supporting its decision to assign a particular value to a marital asset." *Id*. at 13-14.

[30] Here, when determining a value for the Oriental Street house, the trial court reduced the $122,000 appraised value by the outstanding $33,987.66 mortgage but did not reduce it by the cost of the sewer repairs as Stephen requested. The $122,000 appraisal occurred in September 2017. Stephen testified that Veronica arranged the appraisal and that he was not present when it occurred, such that the appraiser would not have known about the needed repair or its cost. Stephen also testified that the plumbing estimate occurred after the appraisal, but later in his testimony conceded that the plumbing repair estimate occurred months prior, in May 2017. Consistent with that, the full appraisal (presented with the motion to correct error) reflected that the appraiser was made aware by

the "owner" – whether that was Veronica or Stephen is not clear – of the broken sewer line and Hope Plumbing's estimate for the cost of the repair, but assumed for purposes of the appraisal that the city would cover that expense. *Appellant's Appendix* at 64. There was no testimony presented at the final hearing from the plumber or a representative of the city or from Stephen regarding whether the city would in fact be responsible for the repair, as the appraiser assumed. Based on the record before us we cannot say that the trial court abused its discretion when it declined to reduce the appraised value by the cost of the sewer repairs.

[31] We next turn to the value of Stephen's 401(a) retirement account, which the court valued at $48,683.31. At the final hearing, Stephen presented an exhibit comprised of various statements and documents, reflecting his proposal of the assets and debts that comprised the marital estate. One of the documents therein was a statement from IBEW #481 reflecting a value of $46,155.57 as of September 30, 2016. The only evidence of additional contributions to IBEW #481 were two checks that he wrote in December 2016 – after the November 2016 date of filing – in the amounts of $1448.26 and $1413.05. Stephen was not asked about and did not testify to making any contributions after September 30 and before the date of filing in November, and it was unclear whether those two payments in December were for his account only or were intended to be contributions on behalf of Internet Guys to other employees' accounts as well. Veronica presented a summary exhibit that listed the 401(a) having a value of $48,683.31. She did not testify to and there was no evidence presented

concerning the basis for that figure. Although Stephen did not object to her exhibit, we cannot say that the $48,683.31 value assigned by the trial court to represent the account's value on the date of filing was supported by the evidence. Therefore, we reverse the trial court's finding #44 and conclusion #66(g), where the court values the 401(a) account at $48,683.31, remand to the trial court with instructions to use the value of $46,155.57, and revise the equalization payment owed by Stephen to Veronica accordingly.

[32] Stephen also challenges the trial court's valuation of the ATI physical therapy bill. The court's division of property utilized the full amount owed of $4204.31, and not the patient balance amount. Stephen argues that this was an abuse of discretion because "the invoice is clear that Veronica only owes $527.26 to ATI." *Appellant's Brief* at 24. However, Veronica testified she did not know whether insurance had paid all or any of the $3577.05 "insurance balance" and stated that she believed the insurance lapsed in March 2017. *Appellee's Appendix* at 38. Stephen does not dispute that it lapsed but argues that it did so in May 2017 because Veronica closed the Internet Guys' bank account and denied him access such that the employer-paid insurance lapsed. While it is not clear if Stephen obtained replacement health insurance, it is clear that, according to the parties' preliminary agreement, Stephen was to keep Veronica on his insurance "until the divorce is over" and that did not occur. *Appellant's Appendix* at 111. We cannot say that the trial court's decision to include the full balance owed on the ATI bill was an abuse of discretion.

## II. Control of Internet Guys and Payment of Debt

[33] The trial court determined that, after the petition was filed, Stephen took control over and was in possession of Internet Guys. Thus, the court did not give Stephen credit in its division of the marital estate for his payment of the business-related bills during the pendency of the action. Stephen argues that these determinations were erroneous. We disagree.

[34] The record reflects that, when Veronica withdrew the $21,900 from Internet Guys' bank account, Stephen removed his laptop, two printers, cell phones, and the company's checkbook, and, according to Veronica he had access to the company's clients, billing, and other financial information. When she made calls to the phone number for Internet Guys over the course of a couple weeks, Stephen or another former Internet Guys employee answered. Betty Lou testified there really was no difference between the two companies in that both companies did the same work for mostly the same clients. Based on this record, we find that the trial court did not err when it found that Stephen had control of Internet Guys and declined to award him credit for his payment of bills associated with that company.

## III. Division of Estate

[35] Stephen challenges the trial court's division of the marital estate, noting that both parties requested a 50/50 split, but the trial court's division resulted in a 60/40 split in favor of Veronica. The division of marital assets is within the trial court's discretion, and we will reverse a trial court's decision only for an

abuse of discretion. *Smith v. Smith*, 136 N.E.3d 275, 281 (Ind. Ct. App. 2019). We may not reweigh the evidence or assess the credibility of the witnesses, and we will consider only the evidence most favorable to the trial court's disposition of the marital property. *O'Connell*, 889 N.E.2d at 10.

[36] The division of marital property in Indiana is a two-step process. *Id*. First, the trial court determines what property must be included in the marital estate, and second, the trial court must then divide the marital property under the statutory presumption that an equal division of marital property is just and reasonable. *Id*. at 10-11. A party challenging the trial court's division of marital property must overcome a strong presumption that the trial court considered and complied with the applicable statute, and that presumption is one of the strongest presumptions applicable to our consideration on appeal. *Id*. at 10.

[37] Under Ind. Code § 31-15-7-5, "[t]he court shall presume that an equal division of the marital property between the parties is just and reasonable."

> However, this presumption may be rebutted by a party who presents relevant evidence, including evidence concerning the following factors, that an equal division would not be just and reasonable:
>
> * * *
>
> (3) The economic circumstances of each spouse at the time the disposition of the property is to become effective, including the desirability of awarding the family residence or the right to dwell in the family residence for such periods as the court considers just to the spouse having custody of any children.

(4) The conduct of the parties during the marriage as related to the disposition or dissipation of their property.

(5) The earnings or earning ability of the parties as related to:

(A) a final division of property; and

(B) a final determination of the property rights of the parties.

I.C. § 31-15-7-5. "'The statutory factors are to be considered together in determining what is just and reasonable; any one factor is not entitled to special weight.'" *Smith*, 136 N.E.3d at 282 (quoting *In re Marriage of Lay*, 512 N.E.2d 1120, 1125 (Ind. Ct. App. 1987)).

[38] Stephen argues that the trial court failed to "expressly outline the statutory factors and reasons it relied upon when deviating from an equal division of the estate." *Appellant's Brief* at 31. We disagree. The court found that Stephen had a greater earning ability, with him earning $46 per hour and Veronica earning $12 per hour. Stephen asserts that this finding was unsupported by the evidence because (1) he testified, "I start school next Monday" and would be earning $27 per hour working fifteen hours per week for Daedalus and Iapyx, and (2) there was no evidence presented as to Veronica's hourly wage rate or weekly earnings. *Transcript* at 7. However, the trial court was not required to believe Stephen's testimony about starting college, how much he would be working, or what he would be earning. We will not reweigh that evidence. As to Veronica's income, we agree with Stephen that there was no evidence presented

as to Veronica's hourly wage rate, with the evidence being only that she worked six days per week at a call center. While Veronica testified that at some point prior to the marriage she was making around $80,000, there was evidence that she worked very little during the marriage, and when she did, it was either in some capacity at Internet Guys, although the evidence was that she was not very involved there, or at Goodwill or Long John Silvers. More importantly, there was testimony that she was not able to work, although that subject was not explored or explained at the final hearing. On this record, we do not find that assigning an hourly wage to Veronica of $12 per hour was erroneous.

[39] In addition, the evidence was that Stephen earned his GED, then an associate's degree, and he testified that he was about to begin full-time classes at IUPUI to obtain a bachelor's degree. There was no evidence as to Veronica's education. Given this record, we cannot say that the trial court erred when it determined that Stephen had a greater earning ability than Veronica.

[40] The court also recognized that "Husband refinanced the Oriental home after a temporary restraining order was entered at the Preliminary Hearing." *Appellant's Appendix* at 43. Per the parties' agreement, neither party was to encumber marital assets. While Stephen testified that he and Veronica had agreed to do so and that the process took a long time to complete, such that it closed after the petition was filed, Veronica testified that she never agreed to refinance the home and was, in fact, opposed to the idea when they discussed it. While Stephen said he used the money to pay various marital and business-related bills, Veronica testified that she believed he kept the money. It was the

court's prerogative to assess witness credibility, and it chose to believe Veronica's testimony concerning refinancing.

[41] Based on the record before us, we find that Stephen has not met his burden of persuading us that the trial court abused its discretion in its division of the marital estate. On remand, we instruct the trial court to value Stephen's 401(a) account at $46,155.57 and revise the equalization payment owed by Stephen accordingly.

[42] Judgment affirmed in part, reversed in part, and remanded.

Bailey, J. and Crone, J., concur.